## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **EVA WIGGINS,** | : | **CIVIL ACTION NO.:** |
| **Plaintiff** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **ING U.S., INC. and** | : | |
| **ING LIFE INSURANCE AND** | : | |
| **ANNUITY COMPANY,** | : | |
| **Defendants** | : | |
| | : | **JULY 29, 2014** |

## COMPLAINT

### INTRODUCTION

1.       This is an action arising out of illegal actions by senior executives at

Defendant ING U.S., INC. (now known as Voya Financial, Inc.) and one of its

subsidiaries, ING Life Insurance and Annuity Company (now known as Voya Retirement

Insurance and Annuity Company).  Plaintiff was formerly employed by Defendants as an

Operations Consultant for ING Life Insurance and Annuity Company.  During her

employment, Plaintiff communicated serious and widespread irregularities in the

processing of terminated retirement plans that reflected a lack of compliance with

federal securities laws.  These included, *inter alia*: frequent inaccuracies in market value

assessments on retirement plans that were being terminated and sent to other

providers, incorrect and inconsistent application of deferred sales charges, and

deliberately failing to provide identified "problem" files for quarterly auditing procedures.

After bringing these irregularities to the attention of her supervisors, and through them

to the Compliance Department and upper management at ING Life Insurance and

Annuity Company and ING U.S., Inc., Plaintiff found herself shut out of the investigation of these violations, and subjected to negative evaluations, verbal and written warnings, and disparate treatment in the terms and conditions of her employment. Shortly thereafter, Defendants terminated her employment in retaliation for her complaints. Plaintiff now brings this action for wrongful termination and retaliation under the Sarbanes-Oxley Act (hereinafter "SOX" or the "Act"), codified at 18 U.S.C. § 1514A, Section 922 of the Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. 111-203, 15 U.S.C. § 78u-6 ("Dodd-Frank"), and Connecticut General Statutes § 31-51q.

**THE PARTIES**

2.      Plaintiff, Eva Wiggins ("Plaintiff"), is an individual with a residence in Ellington, Connecticut.

3.      Defendant ING Life Insurance and Annuity Company (now known as Voya Retirement Insurance and Annuity Company) ("ILIAC") is a Connecticut corporation whose principal place of business is One Orange Way, Windsor, Connecticut. Defendant ILIAC is a subsidiary or affiliate of Defendant ING U.S., Inc. (now known as Voya Financial, Inc.) ("ING") and its financial information is included in the consolidated financial statements of ING, within the meaning of 18 U.S.C. § 1514A(a)(1). Defendant ILIAC is also an agent of ING within the meaning of 18 U.S.C. § 1514A(a)(1). Defendant ILIAC was Plaintiff's employer, and is subject to the provisions of 18 U.S.C. § 1514A, 15 U.S.C. § 78u-6(h), and Conn. Gen. Stat. 31-51q.

4.      Defendant ING U.S., Inc. (now known as Voya Financial, Inc.) ("ING") is a Delaware corporation whose business address is 230 Park Avenue, New York, New

2

York. Defendant ING is a company with a class of securities registered under Section 12 of the Securities Exchange Act of 1934 (15 U.S.C. 781), or that is required to file reports under Section 15(d) of the Securities Exchange Act of 1934, 15 U.S.C. § 780(d). Defendant ING was Plaintiff's employer, and is subject to the provisions of 18 U.S.C. § 1514A, 15 U.S.C. § 78u-6(h), and Conn. Gen. Stat. § 31-51q. Defendant ILIAC and Defendant ING constitute an integrated employer.

**JURISDICTION**

5.      This Court has subject matter jurisdiction over this matter pursuant to 18 U.S.C. § 1331 because it presents a federal question under 18 U.S.C. § 1514A, and 15 U.S.C. § 78u-6(h). This Court has supplemental jurisdiction over Plaintiff's State Law claims pursuant to 28 U.S.C. § 1367.

6.      Plaintiff has satisfied all procedural and administrative requirements under 18 U.S.C. § 1514A, as Plaintiff previously filed a complaint with the U.S. Department of Labor, OSHA ("OSHA") on August 9, 2013, and notified OSHA of her intent to file this action more than 15 days ago and after her complaint had been pending for more than 180 days.

7.      . On July 11, 2014, Plaintiff received a letter dismissing the complaint, and stating that Plaintiff had filed her timely complaint on August 9, 2013; that over 180 days had passed since she filed her complaint; and that the Secretary had not issued a final decision on the complaint. The letter further states that since "there is no showing that such delay is due to the bad faith of the complainant, the complainant may bring a *de novo* action in Federal District Court."

**BACKGROUND**

8.     Plaintiff began her employment with Defendants in February 2006 as a customer contact center associate.  Approximately 18 months later she was promoted to senior customer service associate, and in May 2008 was again promoted to the position of Operations Consultant, the position she held until her termination in February 2013.

9.     During the term of her employment with Defendants, Plaintiff was registered with the Financial Industry Regulatory Association ("FINRA"), and held NASD 6 and 63 licenses.

10.     As an Operations Consultant for Defendants, Plaintiff was responsible for the coordination and liquidation of 401(k), 403(b), 401(a) and 457 retirement plans, including, at the customer's request, consolidating and liquidating assets, setting up new plan carriers and the transfer of assets and files to the new carrier, for plans ranging in value from several thousands of dollars to multimillion dollar plans.

11.     After her promotion to Operations Consultant and its attendant responsibilities, Plaintiff noticed widespread problems with the internal policies and procedures put in place by Defendants, and the implementation and application of these internal policies and procedures.  These problems included the violation of SOX audit requirements, which Plaintiff consistently discussed with her supervisors and managers.

12.     Plaintiff noticed that market value assessments ("MVAs") were consistently incorrect, and she repeatedly raised concerns about those inaccuracies. MVAs were determined at the time a plan was being liquidated and transferred from ING to the new carrier on an individual plan by plan basis.  Even after the process was automated, the MVAs were still frequently incorrect.  Valuation of a plan at the time of

4

transfer is critical, since the MVA at the time of liquidation by ING was used to determine the plan's value at inception with the new carrier. Incorrect MVAs which were not caught and corrected represented potential losses to the client plan and potential losses of retirement funds for individual consumers. As a publicly traded company, ING has an obligation to keep accurate books and records under the Securities Exchange Act of 1934 and the Foreign Corrupt Practices Act. As a registered investment adviser, ILIAC has a fiduciary duty to investors under the Federal Investment Adviser's Act of 1940, and is required to have in place a system of internal controls sufficient to provide reasonable assurances that transactions are executed in accordance with management's authorization, transactions are recorded as necessary to permit preparation of financial statements and to maintain accountability for assets, and that access to assets is limited to management's authorization.

13.    Plaintiff consistently brought the issue of the incorrect MVAs to the attention of her supervisors and managers. Yet, the inaccuracies persisted because Defendants' management failed to take corrective action regarding these problems.

14.    Plaintiff also noticed that deferred sales charges were frequently being incorrectly imposed on plans being liquidated and transferred. Rather than assess sales charges at the time of accrual, the assessment of these deferred sales charges was done when the plans were being liquidated, in an arbitrary and inconsistent manner by individuals within the department. The improper assessment of deferred sales charges resulted in income for ILIAC and a loss to the client plan and potential losses of retirement funds for individual consumers. As a registered investment adviser, ILIAC has a fiduciary duty to investors under the Federal Investment Adviser's Act, and is

required to have in place a system of internal controls sufficient to provide reasonable assurances that transactions are executed in accordance with management's authorization, transactions are recorded as necessary to permit preparation of financial statements and to maintain accountability for assets, and that access to assets is limited to management's authorization.  The erroneous imposition of deferred sales charges on these plans resulted in Defendants collecting additional funds that they were not entitled to, from individuals/entities to whom Defendants owed fiduciary obligations.  This represented a breach of Defendants' fiduciary duty of care in violation of the Federal Investment Advisers Act of 1940.  Further, it represented another example of deficiencies in Defendants' internal controls.

15.    Plaintiff consistently brought the issue of the deferred sales charges to the attention of her supervisors and managers; Defendants' management took no corrective action regarding these problems and the problems persisted.

16.    As Plaintiff's department was considered high risk, it underwent quarterly SOX audits as a matter of course.  Plaintiff noticed that plans which had accounting issues or errors were frequently removed from the database used by auditors to identify plans to be audited during these quarterly SOX audits.  In extreme cases, the files of "problem" plans which were identified for audit went missing completely, only being located after the SOX audit was finished.   As a publicly traded company, ING has an obligation to keep accurate books and records under the Securities Exchange Act of 1934 and the Foreign Corrupt Practices Act.  Defendant is also required to have in place a system of internal controls sufficient to provide reasonable assurances that transactions are executed in accordance with management's authorization, transactions

6

are recorded as necessary to permit preparation of financial statements and to maintain accountability for assets, and that access to assets is limited to management's authorization.

17.    Plaintiff consistently brought the issues regarding failing to allow access to problem plans for auditing purposes to the attention of her supervisors and managers; Defendants' management took no corrective action regarding these problems, and the problems persisted.

18.    Defendants had in place a system for review of work by individuals in the department.  Plaintiff was assigned to review the work of others, and other individuals would review Plaintiff's work, to ensure that the work was done accurately and completely.  At the end of the day, Plaintiff refused to sign off on work that she had not yet had time to review, or that was inaccurate or incomplete.  However, the next day Plaintiff frequently found that another individual in the department had approved the work at the direction of management, even though it was incomplete or contained errors.  This frequently resulted in losses to the company, and to the Defendants' clients and investors.  As a publicly traded company, ING has an obligation to keep accurate books and records under the Securities Exchange Act of 1934.  Defendant is also required to have in place a system of internal controls sufficient to provide reasonable assurances that transactions are executed in accordance with management's authorization, transactions are recorded as necessary to permit preparation of financial statements and to maintain accountability for assets, and that access to assets is limited to management's authorization.

19.    Plaintiff consistently brought the issue of improper signoffs on incomplete and/or incorrect work to the attention of her supervisors and managers; Defendants' management took no corrective action regarding this problem, and the problem persisted.

20.    Plaintiff noticed that on a number of occasions files and assets were sent out to new carriers prior to the receipt of authorization by the client, in breach of the service agreement with the client.

21.    Plaintiff consistently brought the issue of premature transferring of files and assets to the attention of her supervisors and managers; Defendants' management took no corrective action regarding the problem, and the problem persisted.

22.    Plaintiff noticed that on a number of occasions, the files and assets of the wrong plan were sent to the new carrier, thereby disclosing private personal and financial information to nonaffiliated third parties, and subjecting clients and investors to potential loss related to identity theft.  Defendants' actions in disclosing private personal and financial information to nonaffiliated third parties is a violation of law, including, but not limited to, the safeguards and duty of care imposed on Defendants under Section 504 of the Financial Services Modernization Act of 1999.

23.    Plaintiff consistently brought the issue of disclosing private personal and financial information to the attention of her supervisors and managers; Defendants' management took no corrective action to remedy the problem, and the problem persisted.

24.    Plaintiff consistently brought the foregoing problems to the attention of her supervisors and managers verbally and through email.  Plaintiff warned them that

although standards were set out they were not being maintained. By engaging in the aforementioned activities, Plaintiff engaged in conduct that is protected under the whistleblower provisions in Section 806 of the Sarbanes-Oxley Act of 2002.

25.    After engaging in the aforementioned activities, Plaintiff began noticing a pattern of disparate treatment by her supervisors and managers. Although a salaried employee, Plaintiff was constantly taken to task by her supervisor, Marion Quigley, if she was required to schedule a personal appointment during the workday, even though she made up the time and frequently worked more than 40 hours per week. Co-workers were not questioned about taking time off, leaving early or coming in late. For instance, although it was common knowledge in the department that one co-worker frequently left work early when the weather was nice to ride his motorcycle, nothing was ever said to him about it. When Plaintiff sought training that was approved for her co-workers, she was denied. Plaintiff spoke to her supervisor several times about co-workers who were unable to keep up with their workload, and the delays this caused in closing out plans as requested by clients. However, it was not until another co-worker complained about the same problem that any steps were taken to address the situation. Although Plaintiff worked out new procedures that cut down on time and errors, and which were implemented throughout the department, she was frequently criticized for her use of the different systems in the department by her supervisor. Plaintiff was reprimanded for reading a book at her desk during her lunch break, although co-workers frequently read books, surfed the internet or shopped on the internet even during working hours. When Plaintiff did leave the building for a lunch break, she was reprimanded and told she could not leave the building without approval.

9

26.     Eventually, Plaintiff was told that she was to no longer put anything in writing with regard to errors made by certain employees, including Kristen Uzdarwin, whose persistent and significant errors were of great concern to Plaintiff.  Shortly thereafter, Plaintiff was told that she was not allowed to assist her co-workers, although she had trained several of them.  She was criticized for sending information out to new carriers too quickly, although the information she sent out was appropriate and correct, and had been authorized.

27.     In 2011, Plaintiff was contacted by FINRA about information regarding many of the issues that she had brought up to her managers.  Plaintiff referred representatives of FINRA to the Compliance Department.  When a formal investigation was undertaken, Plaintiff met with the head of Compliance for ING on at least three separate occasions, during which time she discussed the aforementioned issues she had previously identified to her supervisors and managers.  In December 2011, Plaintiff was told by the head of Compliance for ING that since the issues were not a systemic problem, but rather based on individual problems, there was nothing that the Compliance Department or FINRA could do, and the problem would have to be handled through Human Resources, training and management.

28.     When Plaintiff communicated these matters to the head of Compliance for ING, she engaged in additional conduct protected by the whistleblower provisions in Section 806 of the Sarbanes-Oxley Act of 2002.

29.     Due to the stress created by the hyper-scrutiny and differential treatment she was subjected to, Plaintiff contacted the Human Resources department for assistance.  She began having almost weekly phone calls with Emily Babiash in Human

Resources in an effort to try to deal with the actions being taken against her. At one point, early in 2011, Ms. Babiash suggested that Plaintiff take FMLA to deal with the stress. Although she was initially hesitant to do so, Plaintiff did take FMLA leave in June 2011, although she was refused paid leave.

30.   After Plaintiff's return to work in July 2011, she was subjected to continuing harassment and bullying by her supervisor.

31.   In September 2011, Plaintiff went out on medical leave for a work related condition. Her supervisor gave her a hard time about taking the time off, although Plaintiff had given more than sufficient notice regarding the medical leave. Plaintiff was out for six weeks, during which time she kept Defendant fully up to date on her progress, even making her first call after her doctor's visits to her supervisor. Despite this, Complaint was constantly pressured to return early, and assigned plans to work on even though she was out on approved medical leave. After her return, she was consistently harassed about taking time off for physical therapy and follow-up medical appointments.

32.   After her return to work in November 2011, Plaintiff found herself subjected to even more intense scrutiny. In January 2012 she received her performance evaluation, which included issues regarding attendance. When Plaintiff escalated this issue to Human Resources, it was removed from her evaluation.

33.   Plaintiff also found that her co-workers treated her differently. For instance, in the last week of June 2012, a problem came up with staffing in the office for the 4th of July week. Only Plaintiff and one co-worker were scheduled to work, all the others had been permitted to take vacation time. The individuals who were taking the

holiday week off were requested by management to complete all work that could be done prior to the holiday before they left on vacation. Plaintiff noticed that Jeff Anderson, a co-worker, had missed a procedure. When she asked him about it, Mr. Anderson rudely told her it was a stupid procedure and he was not going to do it. When she asked him if he had completed the prework that the supervisor, Ms. Quigley, had asked everyone to complete, he stated that he had not, that he would not, and whoever worked the following week would just have to do it.

34.    Plaintiff spoke to Ms. Metcalfe, Ms. Quigley's manager, about Mr. Anderson's refusal to do the work and the manner in which he had spoken to her. Ms. Metcalfe set up a meeting to discuss it. The meeting was held soon thereafter. Mr. Anderson, Ms. Metcalfe and Ms. Quigley called Plaintiff, who was working from home that day, and it was stated that Plaintiff and Mr. Anderson just needed to get along. Mr. Anderson was not reprimanded for his manner toward Plaintiff.

35.    Approximately one month later, Plaintiff was working on a regular monthly report as assigned by management, regarding the plans that had been liquidated. When Plaintiff began asking her co-workers for the information for the plan, another co-worker, Susan Labadia, challenged her as to why she was doing it. Plaintiff stated that she was doing the report as requested and this was how it was supposed to be done. Ms. Labadia told her to shut up, and rather than be confrontational, Plaintiff walked away.

36.    Shortly thereafter Plaintiff was contacted by Human Resources and informed that they were starting an investigation, due to her "unprofessional" manner, and that a co-worker felt "threatened." Plaintiff was never told who had complained

about feeling threatened, only that it related to a conversation she had had over a year before when she was talking to Jacob Torres, another co-worker who was in the process of getting a pistol permit.  Plaintiff had informed him during their conversation that although she did not own a gun, 15 years before in college she had been pretty good at target shooting.  The so-called "investigation," in which Plaintiff did not participate, resulted in Plaintiff being written up for unprofessional behavior.  When Plaintiff was informed of the write-up, she asked how she could be written up when she had never even been verbally warned; at that time she was informed that the previous month's phone conference constituted a "verbal warning."  Plaintiff's desk was also moved to the opposite end of the office from Ms. Quigley's work area.

37.     In January 2013, Ms. Quigley was promoted and a new supervisor, Kimberly Gibney, came into the department.  Plaintiff knew Ms. Gibney from prior cross-training sessions.  Plaintiff was candid with Ms. Gibney about the issues and challenges within the department, including all the issues she had consistently raised with the previous supervisor and her manager, Cynthia Metcalfe.  Ms. Gibney asked Plaintiff to keep her informed of any such issues that arose, including issues with errors made by members of the department, particularly Ms. Uzdarwin.  Ms. Gibney was focusing on passing the next audit, and aware that the issues raised by Plaintiff could impact that.

38.     On February 11, 2013, Plaintiff worked 15 hours on a very large and complicated plan that had liquidated the previous week.  Plaintiff was trying to get all of the assets and files transferred in a timely fashion.  That afternoon, Ms. Gibney asked Plaintiff to have coffee with her.  Plaintiff again raised issues regarding a co-worker's errors, and her lack of confidence with Ms. Uzdarwin's work.  At this point in time, Ms.

Uzdarwin was checking Plaintiff's work.  Plaintiff had mistakenly missed four

checkboxes in processing the plan she had been liquidating.  These checkboxes were

for recordkeeping purposes only, and did not affect the liquidation itself.  When Plaintiff

realized she had missed these boxes, she checked to see if Ms. Uzdarwin had caught

the errors when she double checked Plaintiff's work.  Ms. Uzdarwin had not caught the

errors, so Plaintiff fixed them herself.  She mentioned this to Ms. Gibney because she

was concerned that since Ms. Uzdarwin had missed this, she wasn't comfortable with

having Ms. Uzdarwin check her work due to Ms. Uzdarwin's inconsistent performance.

Ms. Gibney told Plaintiff that she did not want her setting Ms. Uzdarwin up to fail, and

Plaintiff explained again that it was a simple error on her part, but she was still

concerned that Ms. Uzdarwin failed to catch the error.  Ms. Gibney told Plaintiff that she

would handle it.

39.    On February 12, 2013, Plaintiff was called into a meeting with Ms. Gibney,

Ms. Metcalfe and a representative from Human Resources, and told she was being

terminated for deliberately trying to bypass audit requirements.  Plaintiff was stunned,

took the papers she was handed and left.  She later learned that Defendant had put on

the U-5 termination form that she had "deliberately tried to bypass audit requirements."

**COUNT ONE:    RETALIATION IN VIOLATION OF THE SARBANES OXLEY ACT,
18 U.S.C. § 1514a**

40.    Defendants illegally retaliated against Plaintiff for her protected conduct in

violation of 18 U.S.C. § 1514A.

41.    By her opposition to the aforementioned activities and her refusal to

participate in them, Plaintiff has engaged in conduct protected by the whistleblower

provisions of the Sarbanes-Oxley Act of 2002, 18 U.S.C. § 1514A.

14

42.     Plaintiff provided information, caused information to be provided, or otherwise assisted in an investigation regarding conduct which she reasonably believed constituted a violation of a law, rule, or regulation covered by 18 U.S.C. § 1514A(a)(1), and provided such information or assistance to persons employed by Defendants with supervisory authority over Plaintiff and persons employed by Defendants who had the authority to investigate, discover, or terminate misconduct.

43.     Defendants had knowledge of Plaintiff's protected conduct, and Defendants subjected Plaintiff to retaliation, including, but not limited to harassment and discharge, because she engaged in the aforementioned protected conduct.

44.     Defendants' actions have caused Plaintiff to suffer damages including, but not limited to, compensatory damages, economic damages, loss of employment benefits, special damages, damage to reputation, interference with future employment, emotional distress, as well as loss of enjoyment of life and loss of enjoyment of profession.

45.     Plaintiff has also incurred, and will continue to incur, attorneys' fees and costs.

**COUNT TWO:     VIOLATION OF DODD-FRANK, 15 U.S.C. § 78u-6(h)**

46.     Defendants illegally retaliated against Plaintiff for her protected conduct in violation of Dodd-Frank, 15 U.S.C. § 78u-6(h).

47.     By her opposition to the aforementioned activities and her refusal to participate in them, Plaintiff has engaged in conduct protected by the anti-retaliation provisions of Dodd-Frank.

48.     Plaintiff made disclosures that are required or protected under SOX, and any other law, rule or regulation subject to the jurisdiction of the Securities and Exchange Commission.

49.     Defendants had knowledge of Plaintiff's protected conduct, and Defendants subjected Plaintiff to retaliation, including, but not limited to harassment and discharge, because she engaged in the aforementioned protected conduct.

50.     Defendants' actions have caused Plaintiff to suffer damages including, but not limited to, compensatory damages, economic damages, loss of employment benefits, special damages, damage to reputation, interference with future employment, emotional distress, as well as loss of enjoyment of life and loss of enjoyment of profession.

51.     Plaintiff has also incurred, and will continue to incur, attorneys' fees and costs.

**COUNT THREE:     VIOLATION OF CONNECTICUT GENERAL STATUTES SECTION 31-51q**

52.     Based on the foregoing, Defendants illegally retaliated against Plaintiff because she engaged in activity protected by Conn. Gen. Stat. § 31-51q.

53.     By engaging in the aforementioned conduct, Plaintiff engaged in speech touching upon matters of public concern, as protected by sections 4 or 14 of Article First of the Constitution of Connecticut and Conn. Gen. Stat. § 31-51q.

54.     Defendants violated Conn. Gen. Stat. § 31-51q when they subjected Plaintiff to discharge and discipline on account of her exercise of her rights guaranteed by sections 4 or 14 of Article First of the Constitution of Connecticut.

55.     Defendants had knowledge of Plaintiff's protected conduct.

56.     Defendants retaliated against Plaintiff because of her protected conduct.

57.     There is a causal connection between Plaintiff's protected conduct and Defendants' retaliation against her.

58.     Defendants' actions have caused Plaintiff to suffer damages, including, but not limited to, compensatory damages, economic damages, loss of employment benefits, damage to reputation, emotional distress, as well as loss of enjoyment of life and loss of enjoyment of profession.

59.     Defendants exhibited a reckless indifference to Plaintiff's rights, or an intentional and wanton violation of Plaintiff's rights, thereby entitle Plaintiff to an award of punitive damages.

60.     Plaintiff has also incurred, and will continue to incur, attorneys' fees and costs.

## DEMAND FOR RELIEF

WHEREFORE, Plaintiff claims a TRIAL BY JURY, and the following damages:

1.      Compensatory damages, including but not limited to, lost wages, lost benefits, depletion of personal savings, emotional distress, humiliation, loss of enjoyment of life and loss of enjoyment of profession;

2.      Special damages;

3.      Back pay, with interest;

4.      Double back pay, with interest, pursuant to 15 U.S.C. § 78u-6(h)(1)(C);

5.      Reinstatement, or front pay;

6.      Statutory punitive damages pursuant to Conn. Gen. Stat. § 31-51q;

17

7.    Attorneys' fees and costs pursuant to 18 U.S.C. § 1514A(c), 15 U.S.C. §
78u-6(h)(1)(C), and Conn. Gen. Stat. § 31-51q; and

8.    Such other relief in equity or law that may pertain.


**JURY DEMAND**

Plaintiff hereby demands a trial by jury.


PLAINTIFF,
EVA WIGGINS

By: _____
Peter B. Prestley (ct15799)
Madsen, Prestley & Parenteau, LLC
402 Asylum Street
Hartford, CT 06103
Tel:  (860) 246-2466
Fax:  (860) 246-1794
pbprestley@mppjustice.com
Her attorneys